**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 20, 2001**

PRYOR R. CROWE, ALBERT E. CONANT,
and EUAN D. SINGLETON,

    Plaintiffs-Appellants,

v                                                   Nos. 115983, 115984

CITY OF DETROIT,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    In this case we are called upon to construe section

161(1)(c)[1] of the Worker's Disability Compensation Act, MCL

_____

[1]Section 161(1)(c) provides:

    Police officers, fire fighters, or employees
of the police or fire departments, or their
dependents, in municipalities or villages of this
state providing like benefits, may waive the
provisions of this act and accept like benefits
that are provided by the municipality or village
but shall not be entitled to like benefits from
both the municipality or village and this act;

418.161.  Section 161(1)(c) authorizes municipalities and villages to offer injured police officers and fire fighters a form of compensation that, while like that provided through Michigan's statutory worker's compensation system, MCL 418.101 *et seq.*, can be tailored to the needs of public safety officers.  The statute allows officers to bargain collectively for beneficial alternatives to the otherwise mandatory state system.

Accepting the invitation of the Legislature, the city of Detroit provides an alternative benefits plan[2] in tit IX, ch VII, art VI, part B, § 2 of the Detroit City Charter.  The charter grants payments during an officer's working life (twenty-five years from the time service as an officer commenced) that exceed what the officer would receive under the WDCA.  But after the twenty-five-year period, described as the "creditable service" period, the officer receives the same amount as an uninjured, retired officer.  During this second

_____

> however, this waiver shall not prohibit such employees or their dependents from being reimbursed under section 315 for the medical expenses or portion of medical expenses that are not otherwise provided for by the municipality or village.  This act shall not be construed as limiting, changing, or repealing any of the provisions of a charter of a municipality or village of this state relating to benefits, compensation, pensions, or retirement independent of this act, provided for employees.

[2]This section was last amended on November 5, 1968, and has been in effect since January 1, 1969.

benefit period, i.e., the "retirement" period,[3] the officer usually receives less than he would have obtained under the WDCA.

I. UNDERLYING FACTS AND PROCEDURAL HISTORY

Detroit Officers Crowe, Conant, and Singleton, following work-related disabling injuries, accepted municipal disability benefits under the city charter. After twenty-five-years of creditable service, they each received the reduced benefit provided by the plan that they had selected. At that point, they sought to revoke their previous elections to avoid the retirement reductions discussed above.

Although they acknowledged having received the enhanced benefits under the city's plan during the preretirement period, they sought to compel the city of Detroit to supplement the "retirement" benefit to match the comparable WDCA benefit. In two of the proceedings, involving plaintiffs Conant and Crowe, the magistrate and the Worker's Compensation Appellate Commission ruled in favor of defendants, reasoning that plaintiffs' election of the entire municipal plan remained in effect and that § 161(1)(c) does not provide for a "re-election."

In the third proceeding, involving plaintiff Singleton,

---

[3]The Detroit charter plan describes these reduced benefits as a "reduced disability allowance." Detroit City Charter, tit IX, ch VII, art VI, part B, § 2(b).

3

the magistrate and the WCAC ruled against defendant, relying on *Hatton v Saginaw*, 159 Mich App 522; 406 NW2d 871 (1987). *Hatton* held that disability benefits provided by the Saginaw City Charter that are reduced when a worker reaches a certain age were not "like" WDCA benefits. The WCAC nonetheless agreed with the magistrate's criticism of *Hatton*: § 161(1)(c) "is not intended to allow plaintiff the opportunity to jump between benefit programs as it suits his fancy or as benefits change."

The Court of Appeals consolidated the plaintiffs' cases and held that they could not alter their election in order to avoid the reduction in compensation after twenty-five years. Because defendant's charter required the reductions, the Court of Appeals concluded that plaintiffs could not properly claim that they had been surprised:

> While it is true that the amount of benefits plaintiffs now receive represents the same amount they would have received had they retired healthy after twenty-five years of service, it is also true that the amount they now receive remains governed by defendant's charter provision regarding disability pensions. Although the amount plaintiffs receive has been reduced, that reduction constitutes part of defendant's disability pension plan for police officers. The payments plaintiffs receive are still periodic payments for a disability. Consequently, we hold that the benefit payments plaintiffs received from defendant are "like benefits" under § 161(1)(c). [237 Mich App 397, 401-402; 603 NW2d 107 (1999).]

The Court of Appeals reasoned that the altered calculation of

4

benefits did not change their *nature*.

We granted leave to consider whether plaintiffs may withdraw their waivers of WDCA benefits.

We affirm the Court of Appeals decision rejecting plaintiffs' arguments. By accepting "like benefits," plaintiffs chose the *entire* disability plan provided in the charter, *including* reduction of benefits after twenty-five years. The plain language of § 161(1)(c) does not allow plaintiffs to change their election.

## II. STANDARD OF REVIEW

This case requires us to examine the text of § 161(1)(c). Statutory interpretation is a question of law that we review de novo. *The Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000). See also MCL 418.861a(14); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 700; 614 NW2d 607 (2000).

## III. ANALYSIS

The primary goal of statutory interpretation is to discern and give effect to the intent of the Legislature:

> This task begins by examining the language of the statute itself. The words of a statute provide "the most reliable evidence of its intent. . . ." *United States v Turkette*, 452 US 576, 598; 101 S Ct 2524; 69 L Ed 2d 246 (1981). If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or

5

permitted. *Tyrc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). [*Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).]

"Contextual understanding of statutes is generally grounded in the doctrine of *noscitur a sociis*: '[i]t is known from its associates,' see Black's Law Dictionary (6th ed), p 1060. This doctrine stands for the principle that a word or phrase is given meaning by its context or setting." *Tyler v Livonia Pub Schs*, 459 Mich 382, 390-391; 590 NW2d 560 (1999).

Section 161(1)(c) plainly requires disabled officers to choose *either* WDCA benefits *or* "like benefits" provided under a municipal plan. Employees must elect an *entire* plan and may not "re-elect" WDCA benefits after they have waived its provisions.

A contextual reading of § 161(1)(c) supports this interpretation. The statute allows officers in "municipalities or villages . . . providing like benefits" to "waive the provisions of this act and accept like benefits that are provided by the municipality or village but [officers] shall not be entitled to like benefits from both the municipality or village and this act . . . ." This text contemplates an election *of a plan*. The Legislature plainly distinguished municipalities that provide "like benefits" from those that do not. This distinction is based on whether a

**6**

municipality provides a plan.  It does not refer to individual payments or discrete provisions of a plan.

Similarly, the statute provides that an officer who elects "like benefits" "waives the provisions of this act." The statute does not call for waiver of *some* WDCA benefits; it requires a waiver *of the provisions of the WDCA itself*.  Had the Legislature intended to allow employees to *change* an election or to waive some, but not all, benefits, it would not have referred to a waiver of the provisions of the WDCA generally.  Indeed, with regard to medical expenses, the Legislature limited the effect of the waiver providing, "this waiver shall not prohibit such employees or their dependents from being reimbursed under section 315 for the medical expenses or portion of medical expenses that are not otherwise provided for by the municipality or village."  MCL 418.161(1)(c).

Moreover, the statute expressly states that a claimant "shall not be entitled to like benefits from both the municipality or village and this act . . . ."  A claimant who participates in the municipal plan thus cannot claim WDCA benefits.

In these cases, plaintiffs do not dispute that they opted

for and accepted benefits under the municipal plan.[4]  By accepting those benefits, plaintiffs elected the municipal plan *in its entirety* and waived the provisions of the WDCA. They weighed the benefits and detriments of the WDCA and the municipal scheme, and chose the more advantageous plan.[5] Having made that choice, they now seek to withdraw from the bargain because their retirement benefits are less than they would have been under the WDCA.

Plaintiffs and the dissent ignore the plain language of § 161(1)(c).  They compare the WDCA alternative plan with the city's other municipal plan.  The statute, however, directs us to compare the alternative WDCA plan *with WDCA benefits*, *not* to compare one municipal plan with *another* municipal plan.

The question remains, nevertheless, whether disability benefits provided by defendant's charter are "like" WDCA benefits.  We believe that they are.  Our decision in *MacKay v Port Huron*, 288 Mich 129; 284 NW 671 (1939), offers guidance that helps lead us to this conclusion.  In *MacKay*, a

---

[4]At oral argument, plaintiffs' counsel questioned whether an election had been made.  The record reflects, however, that plaintiffs stipulated that they had elected to receive benefits under the municipal plan.

[5]The net of that evaluation is a calculation of which would produce a better return.  This requires the officer and his advisors, lawyers, or union representatives to set greater present benefits off against reduced later, or "retirement," benefits.

firefighter's widow accepted a monthly pension under a city charter. While still receiving this pension, she sought WDCA benefits. The pension was based on "the amount of retirement salary that her deceased husband would have received had he lived and been placed upon the retirement list at the date of his death." *Id*. at 132. This Court found the pension sufficiently similar to worker's compensation benefits:

> The term "like benefits," employed in the statute, does not mean identical benefits or co-extensive in every detail but, considering the full scope thereof, similar in its salient features. The charter benefit of $75 a month, or $900 per year, continues for life, unless plaintiff remarries, while the compensation award of $18 per week, or $936 per year, carries, if there is no remarriage, for 300 weeks at the longest. The $36 per year difference, if considered an inequality, loses sense as such when we give consideration to the time of continuance of each benefit. The statute provides for funeral expenses and the charter benefit does not but this was waived in taking the longer time benefit. [*Id*. at 134.]

> Where one has a right of election to take either of two benefits but not both, and is accorded and accepts and is receiving one, there is waiver of the other. [*Id*. at 135.]

Further, in *Johnson v Muskegon*, 61 Mich App 121; 232 NW2d 325 (1975), the Court of Appeals held that the city's disability retirement pension provision was "like" the WDCA provisions even though the pension provision did not include medical insurance:

> The salient feature in *MacKay* was held to be precisely the salient feature in the case at bar, periodic payments for disability. Further, we

**9**

cannot say that the absence of medical benefits is such an "inequality" as to exclude the operation of the statute. Like *MacKay*, the benefits in this case are not "identical" or "co-extensive in every detail," nor are they required to be. Just as the plaintiff in *MacKay* waived the funeral expenses benefit by electing to receive the pension, so too did the plaintiff in the case at bar waive the medical benefits by accepting the longer benefits under the disability pension. [*Id.* at 126.][6]

We reaffirm the principles articulated in *MacKay* and *Johnson*. The statute does not require that municipal benefits be identical or coextensive in every detail with WDCA benefits. Rather, municipal benefits must be "like" WDCA benefits. Under *MacKay*, "like benefits" are those that are similar in their salient features.

The municipal benefits accepted by plaintiffs here meet this test. Like the WDCA, defendant's charter provides a total package including periodic payments for disability and payments for the period after creditable service, i.e., retirement. While the municipal benefits are not precisely identical in amount or method of calculation to WDCA benefits-because they are sometimes higher and sometimes lower-they are "like benefits" as this Court and the Court of

---

[6]Section 161(1)(c) now excludes from the waiver of WDCA benefits any "medical expenses or portion of medical expenses that are not otherwise provided for by the municipality or village."

Appeals have interpreted that phrase.[7]  Thus, under the plain

[7]Plaintiffs' reliance on language in certain Court of Appeals cases is misplaced.  In *Teddy v State Police*, 102 Mich App 412; 301 NW2d 876 (1980), the Court of Appeals analyzed whether the pension in that case was "like" worker's compensation benefits.  It stated that "[w]hether the benefits are like benefits depends on whether the pension was a disability pension or a retirement pension."  *Id*. at 421.  It then determined that the pension in that case was a retirement pension.

In *Hatton, supra*, the Court of Appeals held that a Saginaw plan did not bar recovery of WDCA benefits by a disabled firefighter who had reached the age of fifty-five. It stated that, although the municipal pension was "still referred to as a 'disability pension,' the worker who attains age fifty-five is actually receiving retirement benefits to which the worker would be entitled regardless of disability. We believe that once a disabled worker attains age fifty-five the pension should be considered a retirement rather than a disability pension."  *Id.* at 531.

The Court of Appeals explained why the interpretation of the Saginaw Charter in *Hatton* does not control here:

> For several reasons, *Hatton* is not reliable authority to be applied in the instant cases. Significantly, the benefit plan in *Hatton* allowed an employee to receive both plan benefits and worker's compensation benefits.  The terms of the Saginaw plan are discussed in *Hatton* and in *Bannan v Saginaw*, 420 Mich 376; 362 NW2d 668 (1984), aff'g *Bannan v Saginaw*, 120 Mich App 307; 328 NW2d 35 (1982).  Furthermore, without much in the way of meaningful analysis, *Hatton* disagreed with the prior decision in *Johnson*, *supra*.  See *Hatton*, *supra* at 532.  Yet the *Johnson* decision relied on a Supreme Court decision, namely, *MacKay*, *supra*.  In addition, for part of its analysis *Hatton* was guided by *Franks v White Pine Copper Division*, 422 Mich 636; 375 NW2d 715 (1985) [which the Legislature has repudiated]. . . . In sum, *Hatton* is not meaningful authority for deciding the issue before us, which concerns a benefit plan established by the city charter of Detroit. [237 Mich App 403-404.]

language of § 161(1)(c), they need not be identical.  *MacKay*,

*supra*.

One cannot rely on one component of the plan, such as the recalculation under the charter after twenty-five years of creditable service.  Rather, the relevant inquiry is the nature of the entire plan, not its discrete components.

## IV. RESPONSE TO THE DISSENT

The dissent contends that our approach would allow a municipality to change its plan after the option was chosen "regardless of whether the benefits are like in kind or purpose to the benefits offered by the WDCA."  Slip op at 7. We reject this characterization.  We do not hold that a city

---

*Hatton* and *Teddy* are distinguishable.  *Teddy* involved a deceased *state* police officer; § 161(1)(c) by its plain terms applies to officer *in municipalities or villages*. *Hatton* involved interpretation of the Saginaw City Charter.  That charter contained language not present in the Detroit Charter. We decline to construe the Saginaw Charter; it is not before us.  Thus, the *Hatton* and *Teddy* cases did not depend necessarily on an analysis that is inconsistent with our holding in this case.

Plaintiffs also cite *Wiedmaier v Comm'r of Internal Revenue,* 774 F2d 109 (CA 6, 1985).  In that case, the court held that after twenty-five years of creditable service, the reduced pension provided by the Detroit Charter is a retirement allowance and thus "income" for tax purposes.

The issue here differs from that decided in *Wiedmaier*. In considering whether municipal benefits are "like" WDCA benefits, we are bound by the plain language of § 161(1)(c). A federal court's interpretation of a federal tax regulation does not control our analysis of the text of a provision of our WDCA.

**12**

may offer "virtually anything" "regardless of whether the benefits are like in kind or purpose to" WDCA benefits. Instead, we have followed the plain language of § 161(1)(c) and our decision in *MacKay*, which is, to repeat, that a municipal plan must offer "like" WDCA benefits, i.e., similar in its salient features.

The statute does not refer to discrete components of a plan or to individual payments of benefits. It refers generically to "like benefits" that are provided by "municipalities or villages of this state." The statute directs that a disabled officer who elects "like" municipal benefits waives "the provisions of the WDCA" itself. This statutory directive means that we must compare an entire municipal plan to the WDCA. The municipal plan here is similar in its salient features to the WDCA because it provides periodic payments for disability. *MacKay*, *Johnson*, *supra*.

The dissent disregards the statutory directive by failing to consider the municipal plan *in its entirety*. Instead, the dissent disaggregates the plan and compares individual components to the WDCA, concluding that benefits received after the twenty-five-year reduction are not "like" WDCA benefits. Under the dissent's approach, plaintiffs would receive the best of preretirement and postretirement periods,

i.e., higher benefits during their "creditable service" years and higher benefits in their "retirement" years.[8]  This approach is not consistent with the statute or our precedent.

Next, the majority and the dissent apparently agree that the phrase "like benefits" does not require precisely identical benefits.  Had the Legislature intended to permit identical benefits, it would have used words such as "identical," "equivalent," or "exactly the same" instead of "like."  But the Legislature did not employ those phrases.  We thus conclude that the plans need not provide exactly the same benefits.  The dissent fails to explain why it does not share our view.

Next, the dissent states that we have "ignore[d] our duty to recognize that the WDCA is a remedial statute that should be liberally construed in favor of the employee, and must be construed to grant rather than deny benefits."  Slip op at 7.  We do not think that the statute at issue is ambiguous.

In any event, if the statutory language were ambiguous,

_____

[8]The dissent agrees that for the period leading up to the twenty-five-year retirement limitation, Detroit gives its disabled police officers and firefighters "like benefits" even though those "like benefits" amount to *more* than similar WDCA disability benefits.  However, when the twenty-five-year retirement limit is reached, Detroit's benefits are "reduced" to the level of *all other retirees.*  The dissent claims that those benefits cease to be "like benefits" at that time *because of the reduction.*  Thus, the dissent's test for "like benefits" seems to depend on whether the benefits are less than or greater than those provided by the WDCA.

**14**

our first duty is to attempt to discern the legislative intent underlying the ambiguous words.  Only if that inquiry is fruitless, or produces no clear demonstration of intent, does a court resort to the remedial preferential rule relied on in the dissent.

The dissent would hold that the Legislature intended disabled employees to receive benefits greater than the nondisabled after twenty-five years of creditable service. This scheme would encourage employees to become disabled as retirement approached to obtain greater benefits.[9]  The act has never been construed as providing a disincentive for recovery and return to work.[10]  We decline to "construe" this section of

---

[9]In *Franks, supra* at 654, we observed that worker's compensation benefits are meant, as are other similar social welfare benefits programs, to provide a "safety net [by] means of income maintenance for persons who have met misfortune or whose regular income has been cut off."

In the course of determining that the Legislature could properly provide for coordination of benefits, we quoted remarks made by Governor William Milliken concerning the coordination of benefits legislation that are equally applicable in the current context:

> To start with, we must keep in mind that the purpose of workers' compensation, after all, is to restore wage-earning capacity lost in on-the-job accidents.  Worker's compensation was never intended to be more lucrative than gainful employment or to be a retirement bonus. [*Franks, supra* at 655, quoting remarks by Governor William G. Milliken to the Ann Arbor Chamber of Commerce on November 18, 1981.]

[10]As Theodore J. St. Antoine, the Governor's Special Counsel on Workers' Compensation, stated in a report

**15**

the WDCA to create incentives that other areas of the act spurn.

The dissent's construction would create classes of disabled employees-i.e., officers disabled before reaching twenty-five years of service and officers disabled after reaching twenty-five years of service-who are treated differently without apparent reason. Under the dissent's approach, those injured early would receive greater benefits than those injured later. A reasonable inference is not available that the Legislature intended to create unequal outcomes.

Moreover, the dissent's analysis would likely cause municipalities to repeal ordinances providing "like benefits" and thus ultimately deprive police and fire personnel of a valuable benefit.[11] If we were to judicially engraft onto the statute a right to make two elections of benefits—one at the time of the disability and the second when the years-of-service limitation is triggered—municipalities would not

entitled, *Report on Workers' Compensation in Michigan: Costs, Benefits, and Fairness*, presented on December 12, 1984 to Governor James J. Blanchard's Cabinet Council on Jobs and Economic Development, there is a "long-standing notion that income replacement should not be total lest it prove a disincentive to work . . . ." [Quoted in *Franks, supra* at 658.]

[11]The record reflects that plaintiffs Crowe and Conant received greater benefits under the municipal disability plan than they would have received under the WDCA.

**16**

establish an independent disability scheme because it would lead to increased costs. As a result, disabled police and fire personnel in the future would be forced to rely entirely on the disability benefits conferred by the WDCA. Thus, the dissent's interpretation would effectively nullify the statutory option of "like benefits" for which public safety officers and their advocates successfully petitioned the Legislature.[12]

Further, would the Legislature have created a pending financial trap for unwary cities that chose, at the Legislature's invitation, to create a beneficial program for injured public safety officers? The majority believes the Legislature would not do such a thing, but this outcome would ensue if the dissent's approach prevailed. Detroit, either as a self-insurer offering "like benefits," or as an insured paying premiums to an insurance company on the basis of the risks, would be forced to finance benefit payments for which no insurance reserves exist; that is, for unanticipated, and

---

[12]Further, the current "like benefits" options resulted from collective bargaining between the city and the police and firefighters' unions. The collectively bargained city charter provision treats all retirees the same. Once the twenty-five-years-of-credited-service limitation is reached, all police or fire retirees—whether disabled or able-bodied—receive benefits at the same level. It is not surprising that a union would seek to obtain identical benefits for its members rather than to create discrete classes of employees who would receive different benefits.

thus unfunded, risks. The Legislature plainly expressed no intent to require cities to raise local taxes or cut other programs to finance such additional responsibilities. In light of these considerations, any ambiguity in the statute would support our conclusion that the Legislature did not intend to allow a second election of benefits.

Finally, the remedial rule of preference cited by the dissent requires courts to determine how an interpretation of the statute would affect all similarly situated claimants, not merely the particular claimants in a particular case. The dissent stands the doctrine on its head; it construes the statute in favor of the particular plaintiffs, but against the entire class of disabled officers. Under the dissent's approach, these municipal plans would cease to exist. Thus, the remedial legislation doctrine, if it applied, would support our conclusion.

## V. Conclusion

The plain language of MCL 418.161(1)(c), requires a disabled police officer to choose either WDCA benefits or "like benefits" provided by a municipality or village. By accepting "like benefits," an officer elects the *entire* municipal plan. Section 161(1)(c) does not permit an officer to change an election after it has been made. Plaintiffs accepted periodic payments for disability under defendant's

charter and thereby waived the provisions of the WDCA. Accordingly, we affirm the Court of Appeals decision.

TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, C.J.

PRYOR R. CROWE, ALBERT E. CONANT
and EUAN D. SINGLETON,

    Plaintiffs-Appellants,

v                         Nos. 115983, 115984

CITY OF DETROIT,

    Defendant-Appellee.
_____

CAVANAGH, J. (*dissenting*).

    I am unpersuaded that the plaintiffs continued to receive "like benefits" as defined by MCL 418.161(1)(c) after reaching the twenty-five-year reduction. Therefore, I must respectfully dissent from the majority's holding. Moreover, I cannot agree with the majority's implication that, once an employee has chosen to receive benefits under a municipal plan, he is thereafter precluded from challenging the benefits he receives as not being "like benefits" under the Worker's Disability Compensation Act. I would hold that the benefits the plaintiffs received before the twenty-five-year reduction

were "like benefits" for the purposes of § 161, but that the reduced benefits received thereafter were not "like benefits."

Therefore, I would reverse.

I

The Detroit City Charter provides the following with respect to disability pensions:

Part B—Total Disability Pension and Retirement Allowances.

Sec 1. Duty disability

If a member shall become totally incapacitated for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such member or by the head of his Department such member shall be retired; notwithstanding that during such period of notification he may have separated from service; provided, the Medical Director, after examination of such member shall certify to the Board of Trustees his total incapacity. If said member was separated from service after filing of the written application, and he had attained 25 years or more of service prior to the date of separation, the Board of Trustees, shall retire said member, under this part B (As amended November 5, 1968. In effect January 1, 1969).

Sec 2. Benefits

A member, as defined under article IV, section 1(a), (b), or (c) retired under section 1 above shall receive the following benefits:

(a) If such member shall not at the time of his retirement have a total of twenty-five years of creditable service, he shall receive a disability pension of sixty-six and two thirds percent of his final compensation at the time of his retirement.

2

(b) If such member, at the time of his retirement, shall have a total of twenty-five years or more of creditable service or on the expiration of the period when a member retired and receiving benefits under (a) above would have such total had he continued in active service, he shall receive a reduced disability allowance computed in the same manner as the allowance provided in Part A of this Article with optional benefits as provided in Part H of this Article. [Tit IX, ch VII, art VI.]

The present plaintiffs were retired because of disability at times when each had not attained twenty-five years of creditable service. Each employee received two thirds of his final compensation at the time of retirement in accordance with art VI, part B, § 2(a) of the city charter.

However, the plaintiffs' benefits were reduced pursuant to § 2(b) of the city charter when each plaintiff reached what would have been twenty-five years of creditable service. The amount of "reduced disability allowance," by the terms of subsection (b)'s reduction provision, was "computed in the same manner as the allowance provided in Part A of this Article with optional benefits as provided in Part H of this Article." Part A is entitled "Service Retirement Allowance," and discusses the standard retirement allowance.[1]

The plaintiffs initially received the two-thirds disability allowance provided by § 2(a) in lieu of receiving worker's compensation benefits. Those payments are not at

_____

[1] In other words, part A is not disability based.

3

issue on appeal. The issue on appeal, instead, is the contention that the plaintiffs were impermissibly reduced pursuant to § 2(b). According to the plaintiffs, they were entitled to receive both worker's compensation benefits and municipal benefits because the benefits received by the plaintiffs under the municipal plan were changed from injury-based benefits to retirement benefits when each plaintiff had twenty-five years of creditable service. The defendants contend that § 2(b) is part of an overall disability retirement plan under which the plaintiffs elected to receive benefits after they were injured. Thus, the defendants argue, the benefits provided in the plan are akin to worker's compensation benefits, and the plaintiffs are precluded from receiving "dual" benefits by § 161 of the WDCA.

Thus, in order to fully analyze the parties' arguments, it is necessary to examine the language of the municipal plan under which the plaintiffs are currently entitled to receive benefits, to consider the language of limitation used in § 161, and to determine whether that language of limitation allows the plaintiffs to recover benefits under both the municipal plan and under the WDCA. The language of the charter is provided above. The disputed statutory "election provision" of § 161(1)(c) reads as follows:

> Police officers, fire fighters, or employees of
> the police or fire departments, or their dependents,

4

in municipalities or villages of this state providing like benefits, *may waive the provisions of this act and accept like benefits that are provided by the municipality or village but shall not be entitled to like benefits from both the municipality or village and this act . . . ."* [Emphasis added.]

Further, the act discusses municipal charters by providing that:

This act shall not be construed as limiting, changing, or repealing any of the provisions of a charter of a municipality or village of this state relating to benefits, compensation, pensions, or retirement independent of this act, provided for employees.

With charter and statute in hand, we can turn to the question whether MCL 418.161(1)(c) allows the city of Detroit to deny the payment of worker's compensation benefits to the plaintiffs solely because they elected to receive duty disability pension benefits pursuant to § 2(a) of the city charter in lieu of WDCA benefits. Stated alternatively, the question is whether the conversion of the officers' pensions to reduced disability allowances after twenty-five years of service changed the benefits so that they were no longer "like benefits" for the purposes of § 161. The crux of plaintiff's argument is that the benefits were not "like benefits" under § 161 because they were converted from disability benefits to retirement benefits. According to the defendants, the municipal plan benefits were "like benefits" at the time of election, and retained their character as "like benefits"

5

after the reduction because the benefits were created as part of an overall plan designed to be "like" the WDCA formulation.

## II

In the majority's words, "The plain language of MCL 418.161(1)(c) requires a disabled police officer to choose either WDCA benefits or 'like benefits' provided by a municipality or village. By accepting 'like benefits' an officer elects the entire municipal plan." Slip op at 13. However, nothing in the statutory language provides that an employee may elect a benefits *plan* and that if he does so, he is forever precluded from asserting that the payments being made to him by the city are not "like benefits." The majority's assertion that "[e]mployees must elect an entire plan and may not re-elect WDCA benefits after they have received its provisions," is unsupported by either authority or analysis. Slip op at 6. Although the opinion asserts that a "contextual" reading of the statute supports the approach, nothing in the text or context of the statute says anything about all-encompassing *plans*. Rather, the statutory language provides only that designated employees shall not be entitled to receive "*like benefits*" from the municipality and under the WDCA at the same time.

Under the majority's approach, an employee is able to elect an overall plan by accepting payment from the city under

6

the city's municipal plan. Thereafter, the employee could be bound to accept virtually anything the city offers as part of the plan, regardless of whether the nature of the benefits changes and regardless of whether the benefits are like in kind or purpose to the benefits offered by the WDCA. I am unconvinced that the majority's approach is supported by the language of the WDCA. Further, the majority ignores our duty to recognize that the WDCA is a remedial statute that should be liberally construed in favor of the employee, and must be construed to grant rather than deny benefits. *Hagerman v GenCorp Automotive,* 457 Mich 720; 579 NW2d 347 (1998); *Sobotka v Chrysler Corp* (After Remand), 447 Mich 1, 20, n 18; 523 NW2d 454 (1994).[2]

---

[2] The majority criticizes my citation of a rule that pertains to construction of the WDCA. Yet, this Court has explicitly stated that "[c]ertain general principles govern *any inquiry* into the applicability of a provision of the worker's compensation act. . . . First, the worker's compensation act is remedial in nature, and must be '*liberally construed* to grant rather than deny benefits.'" *Hagerman* at 739 (emphasis added); see also *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000)(citing the remedial rule as supplemental to and not in contravention of the rules offered by the majority). Despite this mandate, the majority would sidestep the rule, and substitute its own preferred approach.

Worse, though the majority claims to merely apply the statute as written, labeling statutory language unambiguous does not make it so. As pointed out in this opinion, the text of the statute itself makes no mention of municipal "plans." The majority implicitly engages in construction, and interprets the statute as meaning that the purpose of § 161(1)(c) is to allow municipalities to create plans that

(continued...)

7

Subsection (1)(c) of § 161 allows injured police officers and firefighters, such as the plaintiffs, to choose whether they wish to receive "like" benefits under a municipal plan rather than under the WDCA. If a plaintiff chooses to receive benefits from the municipality, and those benefits are "like benefits," then § 161(1)(c) operates to bar the employee from receiving payment under the WDCA. While the statutory language makes it clear that the plaintiffs cannot simultaneously receive "like benefits" under the WDCA and the municipal charter, it also implicitly provides that an

---

(...continued)
serve as an alternative form of disability compensation. The majority arrives at a statutory meaning only after construing the context of and purposes behind § 161(1)(c). Not surprisingly, the fruit of the hunt is a statutory meaning that supports the policy concerns expressed at great length by the majority. Slip op at pp 15-18.

Despite the majority's distaste for the idea that officers who have been disabled while acting in the line of duty and thereby been prevented from continuing in active service might receive compensation greater than that of their "able-bodied" counterparts, it is not for this Court to declare that such a result would be unjust. In fact, making such a determination flies in the face of Michigan's disability compensation system. The worker's compensation act is designed to balance various competing considerations; among other factors, the WDCA accounts for the fact that an employer may have limited resources to pay for debilitating personal injuries incurred on the job, the fact that under the WDCA injured employees have no right to sue under negligence principles, and the fact that such employees may have lost the ability to work and advance in their fields of choice. See MCL 418.131(1) and *DiBenedetto*, supra. While § 161 (1)(c) provides municipalities, as self-insurers, to further similar purposes through their own plans, it only bars dual benefit recovery for like benefits.

8

employee is entitled to receive both worker's compensation benefits and municipal benefits when the two benefits are not like in kind.

Because § 161 does not define the phrase "like benefits," we are left to examine the statutory language and take guidance from precedent. As the majority acknowledges, this Court long ago stated that the determination whether benefits are "like" hinges on whether the benefits are similar in "salient features" considering the full scope of the benefits. *MacKay* v *Port Huron*, 288 Mich 129; 284 NW 671 (1939). Though *MacKay* was decided under a prior version of the WDCA, I agree with the majority's use of the salient features test under the current version of the WDCA. However, in my view, our duty to consider the full scope of the benefits requires that we analyze the salient features of the particular benefits currently being received and challenged, and not only at the benefits received because of an initial election made by a particular plaintiff.

While the fact that the benefits may be associated with an overall benefit plan may be relevant to our determination of whether particular benefits share salient features, I do not believe that a plaintiff's decision to elect benefits under a municipal plan forecloses a determination that a particular benefit rendered under the plan inadequately

addresses the interests intended to be protected by the WDCA. In other words, simply because *one aspect* of a municipal plan provides benefits that are "like benefits" because they have salient features similar to benefits available under the WDCA, it does not follow that *every* benefit allocation made in a municipal plan should automatically be considered a like benefit. I believe that duty binds us to carefully examine the reduced disability benefits the plaintiffs are currently receiving and to determine whether those benefits have salient features similar to the benefits that would be available to the plaintiffs under the WDCA.

Further, I strongly disagree with the majority and the defendant that the "waiver" language of § 161 refers to waiver in the sense that the plaintiffs are barred from asserting a claim of inadequate compensation if they "elect" the city plan. The waiver provision is associated with the election provision. It is true that an injured employee may choose between benefits. It is also true that an employee who chooses between "like benefits" waives entitlement to benefits under the alternative plan. However, the employee does not waive WDCA protection for other benefits. Thus, the city has no right to reduce a plaintiff's overall entitlement to a degree that the benefits are no longer "like benefits."

III

In the instant case, the plaintiffs base their claim on the theory that once their benefits were reduced, they were put on a par with nondisabled retired employees. Thus, in plaintiffs' view, their reduced disability allowances were actually in the nature of retirement benefits rather than in the nature of disability compensation benefits. As such, the benefits were not "like benefits" for the purposes of § 161. I agree with the plaintiffs.

In my view, the "reduced disability allowance" provided to the plaintiffs after twenty-five years of service does not share salient features with the disability-based benefits recoverable under the WDCA. Though the benefits are called a "disability" allowance, it is clear that the purpose of § 2 (b) is to place disabled retirees on a par with other retirees. In their brief, the defendants argue that the plaintiffs should not be entitled to a windfall that would allow them to receive more money after twenty-five years of creditable service than would be received by their nondisabled retired counterparts. The fundamental flaw in the defendant's logic is that the defendant argues that the plaintiffs' *retirement* has been fairly structured, but nonetheless claims that the benefits received after twenty-five years of service are akin to WDCA benefits. If the defendant's argument is accepted, then the conclusion that follows is that employees

11

receive *no* compensation for their disabilities after they reach the point when they would have put in twenty-five years of service.[3] If the WDCA would continue to provide benefits after that point, the charter fails to provide a "like" benefit.

Under the city of Detroit Charter, several aspects of disability payment change once an employee would have had twenty-five years of creditable service. Most obviously, the amount of payment received by the plaintiff is reduced. Although *MacKay* noted that the quantitative amount of benefits need not be exactly the same under a city plan and under the WDCA in order to constitute a "like benefit," *MacKay* also recognized that the full scope of benefits must be considered. In this case, the purpose of the quantitative reduction was to put disabled officers who would have had twenty-five years of

---

[3] The majority criticizes this approach by concluding that municipalities would be discouraged from creating beneficial municipal plans and that individual employees would be encouraged to become disabled. I disagree with both of these criticisms. First, my approach provides for nothing more than the WDCA itself. Municipalities will not be discouraged from providing municipal plans under my approach; rather, they will be encouraged to provide like benefits. Second, I do not share the majority's fear that employees will be motivated to injure themselves to the point of disability so that they will be entitled to disability payments thereafter. In any event, if an employee does become disabled late in his years of service, the payment he would receive under the approach I offer would not be an enhanced retirement benefit. Instead, it would be the standard retirement benefit provided by the municipal plan, plus any non-like disability benefit available to any disabled employee under the WDCA.

12

service into the same retirement payment category as nondisabled officers. This is clearly evidenced by the fact that the charter states that an officer's "reduced disability allowance" is to be "computed in the same manner as the allowance provided in Part A of this Article . . . ." Part A of the article provides the standard retirement plan. Moreover, at the point when an officer's disability allowance is reduced, he is no longer required to undergo a medical examination to certify his continued disability.[4] This further provides evidence that the plaintiffs' status as disabled officers has little bearing on the payments they receive after twenty-five years of creditable service.

This Court has not taken up the exact question presented

---

[4] Further, a change in the method of benefit calculation also occurs. In *Wiedmaier v Comm'r of the IRS*, 774 F2d 109 (CA 6, 1985), the court held that payments received by an injured fireman after twenty-five years of service were nothing more than a retirement allowance, and were not excludable from gross income as benefits in the nature of workmen's compensation. The court reasoned:

> The clear purposed of the [IRS] regulation is to distinguish between benefits that are intended to compensate an employee for lost earning capacity due to an injury . . . and those benefits that are simply a retirement pension in consideration for past services. . . . Under that case, once the twenty-fifth anniversary step-down occurs, the IRS will treat the pension as part of gross income.

As in *Wiedmaier*, the Detroit post-twenty-five-year pension for disabled employees is calculated in precisely the same way as a normal retired person's pension is calculated. *Wiedmaier* is persuasive, and tends to support the conclusion that the benefits being challenged in this case are not like benefits.

13

by this case, but in *Bannan v Saginaw*, 420 Mich 376; 362 NW2d 668 (1984), we considered a city ordinance that adjusted plaintiffs' pension benefits when they reached fifty-five years of age. With regard to the benefit reduction, this Court stated, "We agree with the plaintiffs' contention that to deprive duty disabled retirees of their earned retirement income, after they have become 55 years of age, is contrary to the underlying purpose of the pension ordinance." *Bannan* at 385; see also *Hatton v Saginaw*, 159 Mich App 522, 532; 406 NW2d 871 (1987). Though *Bannan* is not directly on point because it held § 161 to be inapplicable on the grounds that the pension reduction at issue occurred pursuant to a city ordinance rather than a city charter, the overall logic of *Bannan* is persuasive and its message rings loudly. In the present case, depriving the plaintiffs of their disability benefits after they logged twenty-five years of service would be contrary to the purposes behind plans that compensate officers injured while carrying out their duties. Thus, I would apply *Bannan* by analogy and consider the city of Detroit Charter in light of the purposes behind compensating injured officers.

The defendant is clearly attempting to avoid making double payments to the plaintiffs. However, I am unconvinced that the they are simply attempting to avoid paying double

14

*disability* payments as might potentially be precluded by § 161. Rather, I am persuaded that the defendants are attempting to avoid making simultaneous retirement payments and disability payments to injured employees. Perhaps the employer would have recourse under a different section of the WDCA, but I do not believe that the remedy lies in § 161 because the benefits being sought are not "like benefits." I would therefore carry out our duty to liberally interpret the WDCA in favor granting benefits, *Hagerman; Sobotka, supra,* and grant the relief requested by the plaintiffs in this case.

WEAVER and KELLY, JJ., concurred with CAVANAGH, J.